IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

OSCAR OROPEZA,

     Petitioner,

v.                                       Civ. No. 20-1235 KWR/KK

STATE OF NEW MEXICO, *et al.*,

     Respondents.

**MAGISTRATE JUDGE'S PROPOSED FINDINGS
AND RECOMMENDED DISPOSITION**

     THIS MATTER is before the Court on Petitioner Oscar Oropeza's *pro se* Petition Under 28 U.S.C[.] § 2254 for Writ [of] Habeas Corpus by a Person in State Custody (Doc. 1) ("Petition"), filed November 24, 2020. On May 6, 2022, United States District Judge Kea W. Riggs referred this case to me to conduct hearings as warranted, and to perform any legal analysis required to recommend an ultimate disposition of the case. (Doc. 5.) Having meticulously reviewed the parties' submissions, the record, and the relevant law, I find Petitioner's claims to be without merit, and therefore recommend that the Court DENY the claims and DISMISS the Petition WITH PREJUDICE.

## I.    Factual Background and Procedural History

     Petitioner is an inmate at the Otero County Prison Facility in Chaparral, New Mexico, pursuant to a Judgment, Order and Commitment entered on April 26, 2016, in *New Mexico v. Oropeza*, Cause No. D-307-CR-2012-00287, in the Third Judicial District Court for the State of New Mexico. (Doc. 1 at 1-2; Doc. 19-1 at 206-09.) On July 29, 2015, a jury found Petitioner guilty of one count of criminal sexual penetration of a child under the age of thirteen in violation of Section 30-9-11(D)(1) of the New Mexico Statutes Annotated. (Doc. 19-1 at 1, 114.) The state

trial court sentenced Petitioner to an eighteen-year term of imprisonment and an indeterminate term of parole of not less than five years up to Petitioner's natural life. (*Id.* at 206-09.)

Petitioner was arrested on February 6, 2012, and indicted on March 8, 2012. (*Id.* at 19-1 at 1, 52.) In the indictment, the Grand Jury charged Petitioner with one count of Criminal Sexual Penetration in the First Degree (Child Under 13), alleging that he inserted his fingers into the vagina of J.C., who was then twelve years of age or younger, on or about February 4, 2012. (*Id.* at 1.) The Grand Jury also charged Petitioner with one count of Criminal Sexual Contact of a Minor in the Third Degree (Child Under 13), alleging that he unlawfully and intentionally touched the unclothed vaginal area of J.C. on or about the same date. (*Id.*) At his arraignment on March 26, 2012, Petitioner entered a plea of not guilty and was released from custody pending trial. (*Id.* at 3-5, 8.) From his arraignment through the conclusion of trial, Petitioner was represented by privately retained counsel Jose Coronado. (*Id.* at 8, 162, 171.)

On October 28, 2013, Petitioner filed a motion to exclude nine of the State's witnesses, arguing that the prosecution had failed to timely respond to Mr. Coronado's requests for witness interviews. (*Id.* at 13-22.) The state trial court held a hearing on the motion on January 31, 2014, and granted it as to six witnesses, including J.C., on February 5, 2014. (*Id.* at 27.) The court subsequently denied the State's motion for reconsideration, (*id.* at 23-26, 28), and the State appealed. (*Id.* at 29-30.) On February 9, 2015, the New Mexico Court of Appeals reversed the trial court's exclusion of the State's witnesses. (*Id.* at 46-47.) The appellate court entered its mandate and remanded the case to the trial court on April 22, 2015, and the trial court reinstated the case on its docket on June 9, 2015. (*Id.* at 48, 50.)

On June 15, 2015, Petitioner filed a motion to dismiss claiming that his right to a speedy trial had been violated.[1] (*Id.* at 52-59.) On July 2, 2015, Petitioner filed a motion to prohibit witnesses Ruby Lara, Fernando Lara, and Sapphire Lara ("Lara witnesses") from testifying at trial on the basis that they had failed to appear for their scheduled interviews. (*Id.* at 86-87.) The trial court held a hearing on the motion to exclude the Lara witnesses on July 20, 2015, and a hearing on the speedy trial motion on July 24, 2015. (Doc. 19-2 at 125.) The record does not include the trial court's rulings on these motions. (*See generally* Docs. 19-1, 19-2, 20-1, 20-2.) However, the court did not dismiss the charges against Petitioner prior to trial, and the State did not call the Lara witnesses to testify.[2] (*See generally id.*)

Petitioner's jury trial commenced on July 27, 2015, and concluded on July 29, 2015. (Docs. 20-1, 20-2.) At trial, the State presented the testimony of Detective Rafael Medina, J.C., J.C.'s mother Sonia Patricia Cabral, J.C.'s father Fernando Moure,[3] and S.A.N.E. Nurse Diana Portillo. (Doc. 20-1 at 3-73; Doc. 20-2 at 143-235.) Mr. Coronado cross-examined each of these witnesses on Petitioner's behalf. (*Id.*)

Evidence supporting the jury's verdict included the following. Mr. Moure and Ms. Cabral testified that, before the charged assault, J.C. had fallen asleep in the living room of the family home, and Mr. Moure and Ms. Cabral had walked Petitioner to J.C.'s bedroom and left him there to sleep, because he was too intoxicated to drive. (Doc. 20-2 at 148-51, 187-88.) J.C., in turn,

---

[1] The following day, Petitioner amended the motion to include an exhibit that had previously been omitted. (Doc. 19-1 at 60-77.)

[2] In his Petition, Petitioner indicates that the state trial court denied his speedy trial motion on the date of the hearing on the motion. (Doc. 1 at 26.)

[3] In the record, Mr. Moure is sometimes referred to as J.C.'s stepfather rather than her father. (*See, e.g.*, Doc. 20-2 at 139-40.) However, the distinction is immaterial to the claims raised in the Petition. (*See generally* Doc. 1.)

testified that she was sleeping on the couch in the living room when someone picked her up, carried her to her bedroom, placed her in her bed, lay down next to her, put a hand down her pajama pants and underwear, and put a finger or fingers in her vagina. (Doc. 20-1 at 23-26, 29-31.) She further testified that after a few seconds she jumped out of bed and ran to the bathroom, and when she stepped out of the bathroom she looked into her bedroom and saw Petitioner there, which is how she knew he was the one who had assaulted her.[4] (*Id.* at 31-32, 65.) She also testified that she knew who Petitioner was because he had been her brother's football coach and she had met him before. (*Id.* at 33.) J.C. added that as she was walking away from the bathroom, she thought he said to come back, but she did not, instead taking steps to find her parents and disclose the abuse. (*Id.* at 33-37.) Nurse Portillo, who examined J.C. later the same day, testified that she found abnormal redness in J.C.'s vaginal area and a small cut or abrasion to J.C.'s left inner labial area, and that these injuries could have been caused by someone penetrating her with a finger.[5] (Doc. 20-2 at 206-07, 215, 233-35.)

After the State rested, (Doc. 20-1 at 73), the trial court excused the jury and Mr. Coronado moved for a directed verdict, which the court denied. (*Id.* at 74, 77.) In responding to the motion, however, the prosecution agreed that the criminal sexual contact charge should be treated as a lesser included offense of the criminal sexual penetration charge. (*Id.* at 74-77.) After the court and counsel conferred regarding how this would impact jury instructions, Mr. Coronado told the court that, when the jury returned, the court should "just announce that the Defense rests." (*Id.* at 77-79.) The court responded, "You are going to rest as well, no opening?," to which Mr. Coronado

---

[4] Consistent with J.C.'s testimony in this regard, Petitioner includes in his Petition a diagram of the Moure-Cabral home, which shows that there was a bathroom next to J.C.'s bedroom and that a person exiting it would necessarily walk either past or through J.C.'s bedroom door. (Doc. 1 at 14.)

[5] Additional trial evidence will be discussed in Section IV, below, insofar as it is relevant to Petitioner's claims.

replied, "No opening. We're not going to put on any testimony." (*Id.*) Accordingly, when the jury returned, the court announced that "the Defense advises … [t]hey are not going to make an opening and they're not going to call any witnesses. So basically we[']re finished with all of the evidence." (*Id.*) At no time before the trial concluded did Petitioner make any indication on the record that he disagreed with Mr. Coronado's stated decision to rest without presenting any evidence. (*Id.*; *see generally* Docs. 20-1, 20-2.)

In its jury instructions, the trial court directed the jury to consider the charge of criminal sexual contact only if it had a reasonable doubt as to whether Petitioner had committed the crime of criminal sexual penetration. (Doc. 19-1 at 103, 112.) After the court gave the jury its instructions, counsel for both sides made closing arguments, and the jury retired to deliberate. (Doc. 20-1 at 83-113.) On July 29, 2015, the jury returned its verdict, finding Petitioner guilty of criminal sexual penetration of a child under the age of thirteen.[6] (Doc. 19-1 at 114; Doc. 20-1 at 117-18.)

On November 19, 2015, Petitioner filed *pro se* motions for the appointment of new counsel and for a new trial. (Doc. 19-1 at 115-66.) The trial court removed Mr. Coronado as Petitioner's counsel on December 10, 2015, (*id.* at 171), and public defender Mary McMahon entered her appearance on Petitioner's behalf on December 22, 2015. (*Id.* at 177.) The following day, Petitioner filed another *pro* se motion, this one asking that he be released pending further proceedings. (*Id.* at 425-29.)

On January 8, 2016, the trial court held a hearing at which it allowed Petitioner to represent himself with respect to his *pro se* motions, denied the motion for release, and granted the motion for the appointment of new counsel. (*Id.* at 186-88.) Jonathan Miller, a private attorney on contract

---

[6] The prosecution entered a nolle prosequi as to the criminal sexual contact charge on April 22, 2016, and the trial court dismissed that charge on April 26, 2016. (Doc. 19-1 at 205, 207.)

with the public defender, entered his appearance on Petitioner's behalf on January 22, 2016. (*Id.* at 191.) On February 2, 2016, the court denied Petitioner's *pro se* motion for a new trial. (*Id.* at 199-200.) Following a sentencing hearing on April 1, 2016, the court entered its judgment and sentence on April 26, 2016. (*Id.* at 206-09.)

The trial court appointed the office of the public defender as Petitioner's appellate counsel on April 28, 2016. (*Id.* at 213-14.) Sentencing counsel Mr. Miller filed a notice of appeal on May 26, 2016, and a docketing statement on June 27, 2016. (*Id.* at 216; Doc. 19-2 at 95-105.) On August 9, 2016, the state appellate court issued a notice proposing summary affirmance. (Doc. 19-2 at 131-35.) Appellate public defender Nina Lalevic filed a Motion to Recalendar or in the Alternative Motion to Reject Docketing Statement or in the Alternative Memorandum in Opposition to Proposed Summary Affirmance and Motion to Amend the Docketing Statement on March 6, 2017. (*Id.* at 136-45.) On July 27, 2017, the appellate court denied these motions and affirmed the trial court's judgment. (Doc. 19-1 at 254-59.) The New Mexico Supreme Court denied Petitioner's petition for a writ of certiorari on September 26, 2017. (*Id.* at 235-36.)

On August 8, 2018, Petitioner filed a *pro se* petition for a writ of habeas corpus in state district court. (*Id.* at 241-49.) The state district court issued an Order Returning Petition for Writ of Habeas Corpus for Additional Information and Documentation on March 14, 2019. (*Id.* at 268-69.) Accordingly, on May 6, 2019, Petitioner filed a supplemental petition, claiming that: (1) the prosecutor engaged in misconduct by making two improper remarks in closing argument; (2) Petitioner's trial counsel provided him with ineffective assistance by failing to appeal the trial court's denial of his speedy trial motion, failing to interview the Lara witnesses, failing to adequately cross-examine and impeach J.C. and her parents, forbidding Petitioner from testifying at trial, and failing to object to the prosecutor's closing argument; (3) Petitioner's sentencing and

appellate counsel provided him with ineffective assistance, and he was deprived of his right to a meaningful appeal, because sentencing and appellate counsel failed to raise issues they should have raised on appeal; and, (4) the trial court erred in denying Petitioner's *pro se* motion for a new trial. (*Id.* at 270-92.)

Public defender Matthias Swonger entered an appearance on Petitioner's behalf on July 23, 2019, and filed a Notice of Non-Intent to File an Amended Petition for Writ of Habeas Corpus, Clarification of Issues, and Filing of Additional Exhibits on December 20, 2019. (*Id.* at 325-92.) On April 16, 2020, public defender Sarah Gallegos substituted her appearance for Mr. Swonger. (*Id.* at 393.) The state district court held an evidentiary hearing on Petitioner's state habeas petition on August 24, 2020, and issued a written opinion denying it on October 1, 2020. (*Id.* at 432-34.) Petitioner timely filed a petition for a writ of certiorari, which the state supreme court denied on November 12, 2020. (Doc. 19-1 at 435 to Doc. 19-2 at 94.) On November 24, 2020, Petitioner filed the federal habeas Petition now before the Court. (Doc. 1.) Respondents filed their answer on July 20, 2022, (Doc. 19), and Petitioner filed a reply on August 19, 2022. (Doc. 28.)

## II.    **Petitioner's Claims**[7]

In his Petition, Petitioner claims that:

(1)    The prosecution engaged in misconduct that deprived him of his constitutional right to a fair trial by: (a) failing to file a motion for Petitioner's "accusers" to undergo polygraph examinations; (b) presenting perjured testimony; and, (c) making a false and misleading statement in closing argument;

---

[7] Because Petitioner is proceeding *pro se*, the Court construes his pleadings liberally. *See Garrett v. Selby Connor Maddux & Janer*, 425 F.3d 836, 840 (10th Cir. 2005). However, the Court does not "take on the responsibility of serving as [Petitioner's] attorney in constructing arguments and searching the record." *Id.*

(2)     Petitioner's trial counsel provided him with constitutionally ineffective assistance by: (a) failing to file a motion for his "accusers" to undergo polygraph examinations; (b) failing to appeal the trial court's denial of his speedy trial motion; (c) failing to adequately cross-examine and impeach J.C. and her parents; and, (d) forbidding Petitioner from testifying;

(3)     Petitioner's sentencing and appellate counsel provided him with constitutionally ineffective assistance, and Petitioner was deprived of his right to a meaningful appeal, because sentencing and appellate counsel failed to take adequate steps to familiarize themselves with what happened at trial; and,

(4)     The trial court erred in denying Petitioner's *pro se* motion for a new trial.[8]

(Doc. 1 at 1-32.)

## III.    Standard of Review

Under 28 U.S.C. § 2254, a federal court may only grant a state prisoner's petition for a writ of habeas corpus when the prisoner is held "in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). In general, the prisoner must also have exhausted his state court remedies. 28 U.S.C. § 2254(b)(1). When the prisoner's claims have been adjudicated on the merits in state court, a Section 2254 petition can only be granted if the state court's decision was contrary to, or unreasonably applied, "clearly established Federal law, as determined by the

---

[8] The claims in Petitioner's Petition differ from the claims in his supplemental state habeas petition by: (1) challenging only one of the prosecutor's two allegedly improper closing remarks; (2) omitting ineffective assistance of counsel claims based on trial counsel's alleged failure to interview the Lara witnesses and his failure to object to the prosecutor's closing argument; (3) adding prosecutorial misconduct and ineffective assistance of counsel claims based on the failure to move for polygraph examinations; and, (4) clarifying that Petitioner's prosecutorial misconduct claim based on the prosecutor's closing reference to Mr. Moure's and Ms. Cabral's testimony also encompasses a claim based on the prosecutor's presentation of this testimony. (*Compare* Doc. 19-1 at 270-92 *with* Doc. 1 at 1-32.)

Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

A state court decision is "contrary to" clearly established federal law "if the state court applies a rule different from the governing law set forth in [United States Supreme Court] cases, or if it decides a case differently than [the Supreme Court has] done on a set of materially indistinguishable facts." *Bell v. Cone*, 535 U.S. 685, 694 (2002). A state court decision "unreasonably applies" clearly established federal law if it "correctly identifies the governing legal principle from [Supreme Court] decisions but unreasonably applies it to the facts of the particular case." *Id.* "Where … the state court's application of governing federal law is challenged, it must be shown to be not only erroneous, but [also] objectively unreasonable." *Yarborough v. Gentry*, 540 U.S. 1, 5 (2003); *see also Woods v. Donald*, 575 U.S. 312, 316 (2015) ("[A]n unreasonable application of [Supreme Court] holdings must be objectively unreasonable, not merely wrong; even clear error will not suffice.") (quotation marks omitted). "Evaluating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." *Welch v. Workman*, 639 F.3d 980, 1010 (10th Cir. 2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)) (brackets omitted).

"A state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (quotation marks omitted). The state court need not cite to Supreme Court cases, or even be aware of them, "so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early v. Packer*, 537 U.S. 3, 8 (2002). When the decision of the state's highest court does not include reasons but a lower state-court

decision does, "the federal court should 'look through' the unexplained decision to the last related

state-court decision that does provide a relevant rationale" and apply a rebuttable presumption

"that the unexplained decision adopted the same reasoning." *Wilson v. Sellers*, 584 U.S. —, 138

S. Ct. 1188, 1192 (2018).

Review under Section 2254(d) "is limited to the record that was before the state court that

adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 180-81, 185 n.7 (2011);

*Black v. Workman*, 682 F.3d 880, 895 (10th Cir. 2012). Such review must be "highly deferential,"

and the petitioner bears the burden of proof. *Cullen*, 563 U.S. at 181; *Woodford v. Visciotti*, 537

U.S. 19, 24-25 (2002).

> [E]ven a strong case for relief does not mean the state court's contrary
> conclusion was unreasonable.  If this standard is difficult to meet, that is
> because it was meant to be…. [Section] 2254(d) stops short of imposing a
> complete bar on federal-court relitigation of claims already rejected in state
> proceedings. It preserves authority to issue the writ in cases where there is no
> possibility fairminded jurists could disagree that the state court's decision
> conflicts with this Court's precedents. It goes no further. Section 2254(d)
> reflects the view that habeas corpus is a guard against extreme malfunctions in
> the state criminal justice systems, not a substitute for ordinary error correction
> through appeal.

*Harrington*, 562 U.S. at 102-03 (citation and quotation marks omitted).

In Section 2254 proceedings, "a determination of a factual issue made by a State court shall

be presumed to be correct. The applicant shall have the burden of rebutting the presumption of

correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *Welch*, 639 F.3d at 991

("We presume the factual findings of the state court are correct unless the petitioner rebuts that

presumption by clear and convincing evidence."). A petitioner is entitled to an evidentiary hearing

when "his allegations, if true and if not contravened by the existing factual record, would entitle

him to habeas relief." *Anderson v. Attorney General of Kan.*, 425 F.3d 853, 858 (10th Cir. 2005).

However, factual allegations must be "specific and particularized, not general or conclusory." *Id.*

at 858-59. "Moreover, an evidentiary hearing is unnecessary if the claim can be resolved on the

record." *Id.* at 859.

> [B]ecause the deferential standards prescribed by § 2254 control whether to grant
> habeas relief, a federal court must take into account those standards in deciding
> whether an evidentiary hearing is appropriate.  In practical effect ... this means that
> when the state-court record precludes habeas relief under the limitations of §
> 2254(d), a district court is not required to hold an evidentiary hearing.

*Cullen*, 563 U.S. at 183 (citations and quotation marks omitted). I will consider Petitioner's claims

in light of the foregoing standards.

## IV.    Analysis

### a.    Due Process Claims Based on Alleged Prosecutorial Misconduct

#### i.    Prosecution's Failure to File a Motion for "Accusers" to Undergo Polygraph Examinations

In his Petition, Petitioner claims that he was deprived of his constitutional right to a fair

trial because the prosecution failed to file a motion for his "accusers" to undergo polygraph

examinations. (Doc. 1 at 4-5.) Although Petitioner does not clearly identify his "accusers," he

appears to be referring to J.C., Mr. Moure, and Ms. Cabral. (*See generally id.*) Petitioner raised

this claim for the first time in his Petition, and it is therefore unexhausted.[9] However, in their

answer, Respondents ask the Court to deny it on the merits pursuant to 28 U.S.C. § 2254(b)(2),

"notwithstanding non-exhaustion." (Doc. 19 at 15-16.) Courts may deny an unexhausted claim on

its merits if the respondent waives the exhaustion requirement, 28 U.S.C. § 2254(b)(2), (3), and

---

[9] In his reply, Petitioner argues that this claim is not a new, unexhausted one, but rather is part of his exhausted prosecutorial misconduct claim based on the prosecution's alleged use of perjured testimony by Mr. Moure and Ms. Cabral. (Doc. 28 at 10-12.) In fact, however, the two claims are legally and factually distinct.

"it is perfectly clear that the applicant does not raise even a colorable federal claim."[10] *Granberry v. Greer*, 481 U.S. 129, 135 (1987); *Moore v. Schoeman*, 288 F.3d 1231, 1234 (10th Cir. 2002).

Here, Respondents have waived the exhaustion requirement as to Petitioner's prosecutorial misconduct claim based on the prosecution's failure to file a motion for J.C. and her parents to undergo polygraph examinations. (Doc. 19 at 15-16.) Moreover, it is perfectly clear that this claim is not even colorable. To support the claim, Petitioner cites to New Mexico Rule of Evidence 11-707 and several New Mexico cases indicating that polygraph evidence may be admissible in state court provided certain requirements are met. (*See* Doc. 1 at 4-5.) But Petitioner has not cited, and the Court has not located, any authority identifying any circumstances in which the federal Due Process Clause would require the prosecution to file a motion for a witness to undergo a polygraph examination. To the contrary, two federal district court decisions outside the Tenth Circuit have noted the absence of any such authority. *See United States v. Quigg*, No. 15-cr-147, 2021 WL 270672, at *14 (D. Mont. Jan. 27, 2021); *United States v. Ruiz-Herrera*, No. 06-cr-537-3, 2011 WL 13187012, at *4 (E.D. Pa. Mar. 9, 2011).

Furthermore, Rule 11-707 specifically provides that "[n]o witness shall be compelled to take a polygraph examination," thereby prohibiting the relief Petitioner claims the prosecution should have sought. N.M. R. Evid. 11-707(F). And, not only has Petitioner failed to challenge the constitutionality of this rule, (*see generally* Doc. 1), but also it would easily pass federal constitutional muster. *See, e.g., United States v. Scheffer*, 523 U.S. 303, 312, 316-17 (1998)

---

[10] However, courts cannot deny one unexhausted claim and allow the petitioner to return to state court to pursue another. *Moore v. Schoeman*, 288 F.3d 1231, 1235 (10th Cir. 2002). Here, Petitioner asserts two unexhausted claims, *i.e.*, a prosecutorial misconduct claim based on the prosecution's failure to file a motion for polygraph examinations, and an ineffective assistance of counsel claim based on trial counsel's failure to do so. (Doc. 1 at 4-5; *id.* at 18-20.) Consistent with the Tenth Circuit's holding in *Moore*, and for the reasons set forth in this section and Section IV(b)(i), below, I recommend that both of these unexhausted claims be denied.

(upholding constitutionality of blanket rule excluding polygraph evidence in military trials); *cf.*
*Degeare v. Bear*, 769 F. App'x 606, 615 (10th Cir. 2019)[11] (rejecting ineffective assistance of
counsel claim based on appellate counsel's "fail[ure] to challenge Oklahoma's exclusion of
favorable polygraph results" in criminal trials). Petitioner fails to provide any persuasive reason
why the prosecution's compliance with a constitutionally valid state-court rule should be
considered misconduct at all, much less misconduct that violated his federal rights.

Petitioner does suggest that Rule 11-707(F) is inapplicable here by observing that "compel"
means to "force or constrain," and arguing that the motion he claims the prosecution should have
filed "is not to compel (force), but for the 'strategy purpose' to additional proof of honesty or
dishonesty for evidence for trial." (Doc. 28 at 17 (emphasis omitted).) But this argument confuses
purpose and effect. And whatever purpose Petitioner might have envisioned for the motion he
proposes, its effect would plainly be to seek a court order requiring—*i.e.*, forcing or constraining—
polygraph examinations contrary to Rule 11-707(F). For these reasons, I recommend that the Court
deny Petitioner's prosecutorial misconduct claim based on the prosecution's failure to file a motion
for his "accusers" to undergo polygraph examinations.

## ii.  Prosecution's Alleged Presentation of Perjured Testimony

Petitioner also claims that the prosecution committed misconduct that deprived him of his
constitutional right to a fair trial by presenting perjured testimony. (Doc. 1 at 7-8.) In support,
Petitioner contends that the prosecution solicited perjured testimony from Mr. Moure and Ms.
Cabral regarding Mr. Moure's location and activities just before J.C. first told Ms. Cabral that
Petitioner had sexually assaulted her. (*Id.*) Specifically, the prosecution solicited testimony from
Mr. Moure that he was in the shower, he heard J.C.'s voice and a knock on the master bathroom

---

[11] In the Tenth Circuit, unpublished decisions are not binding precedent but may be cited for their persuasive value.
*United States v. Austin*, 426 F.3d 1266, 1274 (10th Cir. 2005).

door, he ran into the master bedroom, Ms. Cabral answered the door, and the disclosure followed. (*Id.* at 39.) Similarly, the prosecution solicited testimony from Ms. Cabral that she and Mr. Moure were showering, Mr. Moure got out, she heard a knock on the bathroom door, Mr. Moure went into the bedroom, she answered the door, and the disclosure followed.[12] (*Id.* at 38.)

In support of his contention that the foregoing testimony was perjured, Petitioner points to Detective Medina's February 2012 police report and Detective Amador Martinez's investigative interview of Ms. Cabral. (Doc. 1 at 7-8, 35-37.) Detective Medina reported Mr. Moure's statement that he and Ms. Cabral were in the master bedroom, and then Ms. Cabral "took a shower. Mr. Moure stated he was preparing to take a shower; however, they received a knock at the door whereupon answering the door, they found [J.C.] crying." (*Id.* at 35.) Detective Medina reported that Ms. Cabral, in turn, "stated Mr. Moure lay down on the bed while Ms. Cabral went to go take a shower. During her shower, she heard a faint knocking at the door, followed by the sound of crying. Upon answering the door, she found [J.C.] standing outside the door crying." (*Id.* at 36.) And a transcript excerpt attached to the Petition indicates that Ms. Cabral told Detective Martinez, "I stepped in the shower and, uh, after that I just hear my daughter knocking on my door," and Mr. Moure was "already in bed" in the master bedroom. (*Id.* at 37.)

Notably, all of the foregoing evidence puts Mr. Moure in the master bedroom when Ms. Cabral answered J.C.'s knock, and somewhere in the master suite just before.[13] Petitioner is correct that there are inconsistencies between the statements in Detective Medina's report, Detective Martinez's interview of Ms. Cabral, and Mr. Moure's and Ms. Cabral's trial testimony. However,

---

[12] Consistently, J.C. testified that before she disclosed the incident to Ms. Cabral, she knocked on the master bathroom door more than once, she heard a shower running and music playing, and her mother, when she finally opened the door, appeared to have just stepped out of the shower because her hair was wet. (Doc. 20-1 at 34-35.)

[13] Petitioner's diagram of the Moure-Cabral home indicates that the master bathroom was accessible from the master bedroom on one side and the laundry room on the other. (Doc. 1 at 14.)

these inconsistencies are limited to exactly where in the master suite Mr. Moure was just before Ms. Cabral answered J.C.'s knock, and exactly what he was doing, *i.e.*, whether he: (a) was showering, but got out and ran into the master bedroom when he and Ms. Cabral heard J.C. knocking, as he and Ms. Cabral testified at trial; (b) was preparing to take a shower, as Mr. Moure reportedly told Detective Medina; (c) was laying down on the bed, as Ms. Cabral reportedly told Detective Medina; or, (d) was "already in bed," as Ms. Cabral told Detective Martinez. (Doc. 1 at 35-39.)

As explained below, the prosecution's presentation of the challenged testimony falls short of justifying the issuance of a writ of habeas corpus under Section 2254. "The Fourteenth Amendment's Due Process Clause prevents the government from knowingly using perjured or false testimony at trial."[14] *Farrar v. Raemisch*, 924 F.3d 1126, 1131 (10th Cir. 2019). And the "same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears." *Giglio v. United States*, 405 U.S. 150, 153 (1972). Moreover, this principle "does not cease to apply merely because the false testimony goes only to the credibility of the witness." *Napue v. People of State of Ill.*, 360 U.S. 264, 269 (1959). "A new trial is required if the false testimony could in any reasonable likelihood have affected the judgment of the jury." *Giglio*, 405 U.S. at 154 (quotation marks and ellipses omitted).

Critically, however, "contradictions and changes in a witness's testimony alone do not constitute perjury and do not create an inference, let alone prove, that the prosecution knowingly presented perjured testimony." *Knighton v. Mullin*, 293 F.3d 1165, 1174 (10th Cir. 2002) (brackets omitted), *abrogated on other grounds by Johnson v. Williams*, 568 U.S. 289 (2013); *United States*

---

[14] Pertinent authority does not distinguish between "perjured" and "false" testimony in this context. *See, e.g.*, *Farrar v. Raemisch*, 924 F.3d 1126, 1131 (10th Cir. 2019); *cf. Nosewicz v. Janosko*, 857 F. App'x 465, 471 n.8 (10th Cir. 2021) (noting distinct standards for motions for new trial in civil cases based on false or perjured testimony).

*v. Wolny*, 133 F.3d 758, 763 (10th Cir. 1998). Also, "witnesses frequently disagree in their interpretation and recollection of events, and tension between witnesses' testimony does not prove subornation of perjury or perjury." *Nosewicz v. Janosko*, 857 F. App'x 465, 471 (10th Cir. 2021) (ellipses and quotation marks omitted).

> Discrepancies in testimony are common, and can generally be explained as resulting from human failings short of intentional lying. To reverse [a] conviction on this ground would bring many, perhaps most, convictions into question. We will reserve such reversals for cases in which perjury and knowledge of perjury are either clear on the record or have been found by the lower court.

*United States v. Gordon*, 657 F. App'x 773, 780 (10th Cir. 2016); *see also United States v. Harmon*, 918 F.2d 115, 117 (10th Cir. 1990) (holding that the "defendant did not show that the government knowingly presented false testimony" where witnesses gave contradictory testimony but "there was no concrete evidence as to which story was correct").

As a preliminary matter, I note that the state habeas court's decision did not address Petitioner's prosecutorial misconduct claim based on the prosecution's presentation of Mr. Moure's and Ms. Cabral's testimony separately from his prosecutorial misconduct claim based on the prosecution's reference to this testimony in closing argument. (*See* Doc. 19-1 at 432-34.) Accordingly, I analyze this claim *de novo. Grant v. Royal*, 886 F.3d 874, 889 (10th Cir. 2018). However, I also apply a rebuttable presumption of correctness to any relevant state-court factual findings. *Id.*

Turning to the substance of the claim, the state habeas court did not find perjury or the prosecution's knowledge of perjury, even though Petitioner pointed out Mr. Moure's and Ms. Cabral's prior inconsistent statements in his supplemental state habeas petition. (Doc. 19-1 at 273-75, 432-34.) Further, neither perjury nor knowledge of perjury is "clear on the record." *Gordon*, 657 F. App'x at 780. Rather, the discrepancies on which Petitioner relies could readily be

"explained as resulting from human failings short of intentional lying." *Id.* Indeed, it seems quite likely that Mr. Moure and Ms. Cabral simply misremembered or misstated Mr. Moure's precise location and activities just before J.C.'s disclosure in their unsworn statements. Both had been awake and drinking alcohol throughout the night and into the early morning hours by the time of J.C.'s disclosure; the disclosure made Ms. Cabral "shocked," "scared," "angry," and "upset"; and, after the disclosure, Mr. Moure's and Ms. Cabral's immediate concerns were to get Petitioner out of the home and to take J.C. to a hospital. (Doc. 20-2 at 146-51, 153-54, 167-78, 184-90, 194-97.)

In addition, there is no reasonable likelihood that the challenged testimony affected the jury's judgment, *Giglio*, 405 U.S. at 154, because Mr. Moure's precise location and activities within the master suite just before J.C.'s disclosure were superfluous to the State's case. J.C. credibly identified Petitioner as the perpetrator of the assault by testifying that she saw Petitioner, whom she knew, in her bedroom shortly after she had been assaulted there, and that he asked her to come back. (Doc. 20-1 at 31-34, 65.) Moreover, Petitioner concedes that he was in J.C.'s bedroom at the relevant time, (Doc. 28 at 4), and points to no evidence that Mr. Moure was there too and so could have committed the charged assault instead of Petitioner.[15] In these circumstances, it is of no import whether Mr. Moure was in the shower in the master bathroom or in bed in the master bedroom just before J.C.'s disclosure.[16] For these reasons, I recommend that the Court dismiss Petitioner's prosecutorial misconduct claim based on the prosecution's

---

[15] This may be why Petitioner claims, not that Mr. Moure was the person who committed the charged assault, but rather that it simply never happened. (*See, e.g.*, Doc. 28 at 4, 30.) As discussed in Section IV(b)(iii), below, at the evidentiary hearing held by the state habeas court, Petitioner's counsel argued that Petitioner's theory was that Mr. Moure committed the assault. (Doc. 21, Evid. Hrg. Rec. at 1:50-2:05.) However, nothing in the record supports counsel's argument on this point. (*See generally* Docs. 1, 19, 20, 28.)

[16] Additionally, and as discussed in Section IV(b)(iii), below, even if Mr. Moure's and Ms. Cabral's prior inconsistent statements diminished their credibility, the presentation of these statements at trial would have been unlikely to affect the jury's judgment, because Mr. Moure's and Ms. Cabral's testimony was peripheral to the ultimate issue of whether Petitioner committed the charged assault.

presentation of Mr. Moure's and Ms. Cabral's testimony about Mr. Moure's location and activities just before J.C. disclosed the charged assault to Ms. Cabral.

### iii. Prosecution's Alleged False and Misleading Statement in Closing Argument

Relatedly, Petitioner claims that the prosecutor violated his constitutional right to a fair trial by arguing in closing that "[t]he only other adult male in that house is her father, and we know where he's at at the time. He's in the bathroom taking a shower with mom." (Doc. 1 at 5-10; *see* Doc. 20-1 at 109-10.) According to Petitioner, this statement violated his right to a fair trial because it was false and misleading. (Doc. 1 at 5-10.) In support of this claim, Petitioner again points to Mr. Moure's and Ms. Cabral's prior inconsistent statements to Detectives Medina and Martinez regarding Mr. Moure's location and activities just before J.C. disclosed the charged assault to Ms. Cabral. (*Id.*)

When "specific guarantees of the Bill of Rights" are not involved, a prosecutor's improper argument warrants habeas relief only when the argument "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974). In determining whether a prosecutor's argument rendered a trial fundamentally unfair, courts view the argument

> in context, considering the strength of the State's case and determining whether the prosecutor's challenged remarks plausibly could have tipped the scales in favor of the prosecution. Ultimately, we consider the probable effect the prosecutor's remarks had on the jury's ability to judge the evidence fairly.

*Neill v. Gibson*, 278 F.3d 1044, 1061 (10th Cir. 2001) (quotation marks and citations omitted). Moreover, although

> a conviction should be overturned if the prosecutor's comments were enough to influence the jury to render a conviction on grounds beyond the admissible evidence presented, … considerable latitude is given the prosecutor in replying to an argument raised by defense counsel's closing statement.

*United States v. Washita Const. Co.*, 789 F.2d 809, 822–23 (10th Cir. 1986) (quotation marks omitted); *see also United States v. Franklin-El*, 555 F.3d 1115, 1126 (10th Cir. 2009) ("Prosecutors have considerable latitude to respond to an argument made by opposing counsel.").

Here, even assuming the challenged remark was improper, which is by no means clear, fairminded jurists could agree with the state habeas court's conclusion that it was not of such weight as to require setting aside Petitioner's conviction and was "invited by defense counsel who raised the question of identity." (Doc. 19-1 at 433.) As to the first point, the prosecutor made the challenged remark to support J.C.'s identification of Petitioner as the perpetrator of the charged assault, arguing that J.C.

> didn't hang around. She didn't look to see, you know, she didn't interrogate him. Who are you? What are you doing? She did what a ten-year-old does. Boom, up. She's walking by, she looks in and he says, Where are you going? She says, it's Oscar. The only other adult male in that house is her father, and we know where he's at the time. He's in the bathroom taking a shower with mom.

(Doc. 20-1 at 109-10.)

However, as discussed in Section IV(a)(ii), above, fairminded jurists could conclude that the challenged remark, and the testimony to which it alluded, were superfluous to the State's case. Again, J.C. positively and credibly identified Petitioner as the perpetrator of the charged assault; Petitioner concedes that he was in J.C.'s bedroom, the scene of the assault, at the relevant time; and, he points to no evidence that Mr. Moure was there too and so could have committed the assault in his stead. In these circumstances, whether Mr. Moure was in the master bathroom or the master bedroom just before J.C.'s disclosure is irrelevant.

As to the state habeas court's second point, the record amply supports that the prosecutor made the challenged remark in response to one of defense counsel's closing arguments. Specifically, during his closing argument, Petitioner's counsel Mr. Coronado tried to cast doubt

on J.C.'s testimony that she saw Petitioner in her bedroom shortly after the charged assault, by pointing out that J.C. had not mentioned this during his pretrial interview of her. (Doc. 20-1 at 94-95.) In other words, he tried to cast doubt on J.C.'s testimony identifying Petitioner as the person who assaulted her. The prosecutor, in turn, made the challenged remark in rebuttal to highlight other evidence corroborating J.C.'s testimony. (*Id.* at 109-10.) The prosecutor was therefore entitled to "considerable latitude" with respect to this argument. *Washita Const. Co.*, 789 F.2d at 822–23; *Franklin-El*, 555 F.3d at 1126. For these reasons, fairminded jurists could agree with the state habeas court's refusal to vacate Petitioner's conviction on the basis of the prosecutor's challenged remark.

In his reply, Petitioner also challenges many other remarks the prosecutor made during closing argument, including one that he challenged in his state habeas proceedings, specifically, "[i]t happened. You know it happened." (Doc. 28 at 18-20; *see* Doc. 19-1 at 286-87; Doc. 20-1 at 110.) But Petitioner waived his claim based on this remark by failing to raise it in his Petition. *Windsor v. Patton*, 623 F. App'x 943, 947 (10th Cir. 2015); *United States v. Carpenter*, 24 F. App'x 899, 905 n.5 (10th Cir. 2001); Rule 2(c)(1), Rules Governing Section 2254 Cases in the United States District Courts. And even if he had not, fairminded jurists could agree with the state habeas court's rejection of the claim. The challenged remark, which Petitioner claims was improper bolstering, was "grounded in evidence," responsive to defense counsel's closing argument, and not "enough to influence the jury to render a conviction on grounds beyond the admissible evidence presented." *Franklin-El*, 555 F.3d at 1125–26; *Washita Const. Co.*, 789 F.2d at 822–23; (*see* Doc. 20-1 at 98.)

As for the other remarks Petitioner challenged for the first time in his reply, Petitioner cites to *Fairchild v. Workman*, 579 F.3d 1134 (10th Cir. 2009), for the proposition that "a habeas

petitioner will be allowed to present 'bits of evidence' to a federal court that were not presented to the state court that first considered his claim, without converting the claim into a new one." *Id.* at 1149 (quotation marks omitted); (*see* Doc. 28 at 18). However, even assuming the *Fairchild* rule applies, at some point new evidence "so changes the legal landscape" that it "effectively makes a new claim." *Fairchild*, 579 F.3d at 1149. And here, Petitioner's legal basis for challenging the remarks discussed for the first time in his reply—*i.e.*, alleged impermissible bolstering—is distinct from his legal basis for challenging the remark discussed in his Petition—*i.e.*, alleged falsity. (Doc. 28 at 18-20.) These other remarks are not, therefore, "bits of evidence" in support of a claim properly made, but rather are new claims, which Petitioner waived by failing to raise in the Petition. *Windsor*, 623 F. App'x at 947; *Carpenter*, 24 F. App'x at 905 n.5. For all of these reasons, I recommend that the Court deny Petitioner's due process prosecutorial misconduct claims based on the prosecutor's closing argument.

### b. Sixth Amendment Ineffective Assistance of Counsel Claims

In the Petition, Petitioner raises a number of claims based on his Sixth Amendment right to the effective assistance of counsel. (Doc. 1 at 18-31.) For a defendant to succeed on a claim of ineffective assistance of counsel, he must demonstrate both that "counsel's representation fell below an objective standard of reasonableness," and that "the deficient performance prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984). In applying this two-pronged test, courts "may address the performance and prejudice components in any order, but need not address both if [the defendant] fails to make a sufficient showing of one." *Cooks v. Ward*, 165 F.3d 1283, 1292-93 (10th Cir. 1998). The *Strickland* test is clearly established federal law within the meaning of Section 2254(d). *Cullen*, 563 U.S. at 189. However, "*Strickland* created a general standard, thus giving 'a state court … more latitude to reasonably determine that a defendant has

not satisfied that standard.'" *Welch*, 639 F.3d at 1010 (quoting *Knowles v. Mirzayance*, 556 U.S.

111, 123 (2009)).

Regarding the first *Strickland* prong,

> [a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.

*Strickland*, 466 U.S. at 689. Judicial review of counsel's performance is "highly deferential," *Byrd*

*v. Workman*, 645 F.3d 1159, 1168 (10th Cir. 2011); and, a defendant must overcome the "strong

presumption" that his counsel "made all significant decisions in the exercise of reasonable

professional judgment" and that "counsel's conduct falls within the wide range of reasonable

professional assistance." *Strickland*, 466 U.S. at 689-90. Courts are required not only to give

defense counsel "the benefit of the doubt," but also to "affirmatively entertain the range of possible

reasons [defense] counsel may have had for proceeding as they did." *Cullen*, 563 U.S. at 196

(quotation marks omitted). "It is rare that constitutionally competent representation will require

any one technique or approach." *Id.* at 195 (quotation marks and brackets omitted).

When asserting an ineffective assistance of counsel claim that the state courts have already

rejected on the merits, the petitioner's burden is even heavier. "The standards created by *Strickland*

and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly

so." *Harrington*, 562 U.S. at 105 (citations and quotation marks omitted); *see also Cullen*, 563

U.S. at 190 (review of *Strickland* claim under Section 2254(d) is "doubly deferential").

> Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard.

*Harrington*, 562 U.S. at 105.

Regarding the second *Strickland* prong, in turn, "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Strickland*, 466 U.S. at 691. Thus, "[t]o establish *Strickland* prejudice a defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Lafler v. Cooper*, 566 U.S. 156, 163 (2012) (quotation marks omitted).

> This does not require a showing that counsel's actions more likely than not altered the outcome, but the difference between *Strickland*'s prejudice standard and a more-probable-than-not standard is slight and matters only in the rarest case. The likelihood of a different result must be substantial, not just conceivable.

*Harrington*, 562 U.S. at 111-12 (citations and quotation marks omitted). Further, "the *Strickland* prejudice prong may not be satisfied through speculation." *Moore v. McKune*, 534 F. App'x 712, 724 (10th Cir. 2013). I will address each of Petitioner's ineffective assistance of counsel claims in light of the foregoing standards.

### i.  Trial Counsel's Failure to File a Motion for Polygraph Examinations

In the Petition, Petitioner claims that his trial counsel provided him with constitutionally ineffective assistance by failing to file a motion for his "accusers" to undergo polygraph examinations. (Doc. 1 at 18-20.) As with his prosecutorial misconduct claim based on the same failure, Petitioner raised this claim for the first time in his Petition, and it is therefore unexhausted. Again, however, Respondents ask the Court to deny the claim on its merits pursuant to 28 U.S.C. § 2254(b)(2), "notwithstanding non-exhaustion." (Doc. 19 at 15-16.) And, as discussed in Section IV(a)(i), *supra*, courts may deny an unexhausted claim on the merits if the respondent waives the exhaustion requirement and "it is perfectly clear that the applicant does not raise even a colorable federal claim." 28 U.S.C. § 2254(b)(2), (3); *Granberry*, 481 U.S. at 135; *Moore*, 288 F.3d at 1234.

Here, Respondents have waived the exhaustion requirement with respect to Petitioner's ineffective assistance of counsel claim based on his trial counsel's failure to file a motion for his "accusers" to undergo polygraph examinations, (Doc. 19 at 15-16); and, it is perfectly clear the claim is not even colorable. As discussed in Section IV(a)(i), Rule 11-707 provides that "[n]o witness shall be compelled to take a polygraph examination." N.M. R. Evid. 11-707(F). Petitioner does not challenge the constitutionality of this rule, (*see generally* Doc. 1), and the motion he claims his counsel should have filed would have sought relief that it directly prohibits. In other words, the proposed motion would have been futile. In these circumstances, trial counsel's failure to file the motion clearly falls within "the wide range of reasonable professional assistance," *Strickland*, 466 U.S. at 689; and, there is no reasonable probability that, but for this failure, the result of the proceeding would have been different. *Lafler*, 566 U.S. at 163. For these reasons, I recommend that the Court deny Petitioner's ineffective assistance of counsel claim based on his trial counsel's failure to file a motion for his "accusers" to undergo polygraph examinations.

### ii.  Trial Counsel's Failure to Appeal Denial of Speedy Trial Motion

Petitioner also claims that his trial counsel provided him with constitutionally ineffective assistance by failing to appeal the state trial court's denial of his motion to dismiss for violation of his speedy trial right. (Doc. 1 at 26-28; *see* Doc. 19-1 at 60-67.) The Sixth Amendment to the United States Constitution guarantees a criminal defendant the right to a "speedy and public trial." *United States v. Keith*, 61 F.4th 839, 852 (10th Cir. 2023). The right "attaches when the defendant is arrested or indicted, whichever comes first," and "detaches upon conviction[.]" *United States v. Muhtorov*, 20 F.4th 558, 634 (10th Cir. 2021), *cert. denied,* — U.S. —, 143 S. Ct. 246 (2022). The Supreme Court has identified four factors courts must balance in determining whether a defendant's constitutional speedy trial right has been violated, *i.e.*, (1) the length of the delay, (2)

the reasons for the delay, (3) the defendant's assertion of his speedy trial right, and (4) the prejudice to the defendant from the delay. *Barker v. Wingo*, 407 U.S. 514, 530-33 (1972); *Keith*, 61 F.4th at 852; *Muhtorov*, 20 F.4th at 634. "No one of the factors is necessary or sufficient to conclude a violation has occurred. Instead, the factors are related and must be considered together along with other relevant circumstances." *Muhtorov*, 20 F.4th at 634. Delays approaching one year or more trigger the four-factor *Barker* analysis. *Id.* at 638.

Here, the state habeas court held that Petitioner failed to show a reasonable probability that, but for his trial counsel's alleged errors, the result of the proceedings against him would have been different, as required by the *Strickland* prejudice prong. (Doc. 19-1 at 432-33); *Lafler*, 566 U.S. at 163. Fairminded jurists could agree with this determination as it applies to Petitioner's ineffective assistance of counsel claim based on his trial counsel's failure to appeal the denial of his speedy trial motion.[17] Regarding the first *Barker* factor, although the approximately three-and-a-half-year delay between Petitioner's arrest and his conviction is sufficient to trigger a constitutional speedy trial analysis, it is not, on its own, enough to establish a violation. *See generally Muhtorov*, 20 F.4th at 637-61 (finding no speedy trial violation despite six-and-a-half-year delay). Rather, the length of the delay is "one factor among several" to be considered. *Id.* at 638.

Further, Petitioner has not shown that the remaining three *Barker* factors weigh so heavily in his favor that any fairminded jurist would find a reasonable probability of success had trial counsel appealed the denial of his speedy trial motion. As to the second *Barker* factor, *i.e.*, the

---

[17] If a speedy trial issue is raised via a direct constitutional claim, rather than an ineffective assistance of counsel claim, habeas relief "is only available if there is no possible balancing of the [*Barker*] factors that both supports the [state court's] ultimate decision and is not contrary to clearly established Supreme Court precedent." *Jackson v. Ray*, 390 F.3d 1254, 1266–67 (10th Cir. 2004). Petitioner raises this issue via an ineffective assistance of counsel claim, and I therefore analyze it as such. (Doc. 1 at 26-28.) However, my recommendation would be the same under the *Jackson* standard, because, as discussed in this section, there are ways to balance the *Barker* factors that would support rejection of the claim and would be consistent with clearly established Supreme Court precedent.

reasons for the delay, fairminded jurists could conclude that much of this delay weighed against Petitioner rather than the State. In particular, Petitioner filed a motion to exclude the State's witnesses on October 28, 2013, and the state appellate court did not resolve this motion and return the case to the state trial court until April 22, 2015. (Doc. 19-1 at 13-22, 46-48.) Thus, Petitioner's own motion arguably caused about one-and-half years of the challenged delay. *Cf. Muhtorov*, 20 F.4th at 640 (delays for which defendant is responsible include delay caused by defendant's motion to suppress evidence). And even if Petitioner were correct that the prosecution's negligence in scheduling witness interviews contributed to this delay, (*see* Doc. 19-1 at 64-65), negligence is "weighted less heavily" against the State than "[p]urposeful delay or delay to gain advantage." *United States v. Margheim*, 770 F.3d 1312, 1326 (10th Cir. 2014).

Fairminded jurists could also find the third and fourth *Barker* factors unhelpful to Petitioner. The Tenth Circuit has called the third factor, *i.e.*, the defendant's assertions of his speedy trial right, "the most important one." *Keith*, 61 F.4th at 853 (quotation marks omitted). For this factor, courts "assess whether the defendant actively asserted his right, which requires more than merely moving to dismiss after the delay has already occurred." *Id.* (quotation marks omitted). "At bottom," courts considering this factor "measure whether the defendant's behavior during the course of litigation evinces a desire to go to trial … by weighing the frequency and force of his objections to the delay." *Id.* (quotation marks and brackets omitted). Infrequent or unforceful assertions, *id.* at 854, as well as those made only on the eve of trial, *Muhtorov*, 20 F.4th at 652-53, weigh against the defendant.

Here, Petitioner first expressly asserted his speedy trial right in his June 2015 motion to dismiss, a little over a month before trial. (Doc. 19-1 at 52-59.) Further, in the motion, Petitioner claimed to have made only one other objection to delay. (*Id.* at 57.) Specifically, he pointed out

that, in his October 28, 2013 motion to exclude witnesses, he described negative consequences he was experiencing due to "[t]he time it is taking his case to proceed to jury trial." (*Id.* at 14-15, 57.) In light of this record, fairminded jurists could conclude that Petitioner's assertions of his speedy trial right were infrequent and could therefore weigh this "most important" factor against him. *Keith*, 61 F.4th at 853-54.

Fairminded jurists could also weigh the fourth factor, *i.e.*, prejudice to the defendant, against Petitioner. "Generally, the court requires a delay of six years before allowing the delay itself to constitute prejudice." *Muhtorov*, 20 F.4th at 653. In cases involving shorter delays, "the defendant must provide evidence of prejudice with sufficient particularity," and "[i]n most circumstances, failure to specify prejudice will eviscerate the defendant's claim." *Id.* (quoting *Margheim*, 770 F.3d at 1329) (quotation marks omitted). Courts consider three factors in analyzing prejudice in the speedy trial context: (1) impairment to the defense, (2) oppressive pretrial incarceration, and (3) the defendant's anxiety and concern. *Id.* at 654. Impairment to the defense is the most important factor, and oppressive pretrial incarceration the second most important. *Id.* Regarding the least important factor, *i.e.*, anxiety and concern, the defendant must show "special harm suffered which distinguishes his case from that of any other arrestee awaiting trial." *Id.*

Here, as to the first factor, Petitioner has not claimed that the delay in bringing him to trial impaired his defense. (*See generally* Doc. 1; *see also* Doc. 19-1 at 65-67, 277 *and* Doc. 19-2 at 9-10.) As to the second factor, Petitioner's pretrial incarceration lasted less than two months and he has failed to show that it was oppressive in this or any other respect. (Doc. 19-1 at 5, 52.) Finally, as to the third factor, *i.e.*, the defendant's anxiety and concern, fairminded jurists could conclude that Petitioner has failed to demonstrate the requisite special harm. Although Petitioner has argued that, due to the charges against him, he lost his job and had difficulty finding and keeping another,

and suffered from anxiety, depression, family conflict, financial stress, social ostracization, and the inability to volunteer with youth sports, (Doc. 1 at 27-28; Doc. 19-1 at 65-67, 277), any arrestee awaiting trial is likely to experience these or equivalent harms.[18] Thus, fairminded jurists could conclude that Petitioner's failure to adequately specify prejudice would have "eviscerate[d]" an appeal of his speedy trial motion. *Muhtorov*, 20 F.4th at 653-54.

In sum, fairminded jurists could balance the *Barker* factors against Petitioner and conclude that Petitioner failed to show a reasonable probability of a different result had his trial counsel appealed the trial court's denial of his speedy trial motion. As such, fairminded jurists could agree with the state habeas court's conclusion that Petitioner failed to satisfy *Strickland*'s prejudice prong with respect to his ineffective assistance of counsel claim based on his trial counsel's failure to pursue such an appeal. *Lafler*, 566 U.S. at 163. For these reasons, I recommend that the Court deny Petitioner's Sixth Amendment ineffective assistance of counsel claim based on his trial counsel's failure to appeal the trial court's denial of his speedy trial motion to dismiss.

### iii. Trial Counsel's Alleged Failure to Adequately Cross-Examine and Impeach Witnesses

In his Petition, Petitioner further claims that his trial counsel provided him with constitutionally ineffective assistance by failing to adequately cross-examine and impeach J.C., Mr. Moure, and Ms. Cabral. (Doc. 1 at 20-25.) Specifically, first, Petitioner claims that his trial counsel should have cross-examined and impeached J.C. and Ms. Cabral because J.C. made a prior inconsistent statement to Mr. Coronado, and Ms. Cabral made a prior inconsistent statement to Detective Martinez, regarding J.C.'s location when she first disclosed the charged assault to Ms.

---

[18] For the first time in his federal Petition, Petitioner adds that his mother had to stop offering childcare out of the home they shared and his brother had to make alternative childcare arrangements. (Doc. 1 at 28.) But, even assuming hardship to others could support a finding of special harm to Petitioner, he did not make these allegations in his state habeas proceedings, and the Court's review under Section 2254(d) "is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen*, 563 U.S. at 181, 185 n.7.

Cabral. (*Id.*) And second, Petitioner claims that his counsel should have cross-examined and impeached Mr. Moure and Ms. Cabral regarding Mr. Moure's location and activities just before J.C.'s disclosure by using the prior inconsistent statements discussed in Section IV(a)(ii), *supra*. (*Id.*)

As to Petitioner's first claim, Petitioner points to no valid basis on which his trial counsel could have impeached or cross-examined J.C. and Ms. Cabral regarding J.C.'s location when she first disclosed the charged assault to Ms. Cabral. At trial, both J.C. and Ms. Cabral testified that J.C. first disclosed the assault to Ms. Cabral after Ms. Cabral opened the master bathroom door in response to J.C.'s knock, shortly after the assault occurred. (Doc. 20-1 at 34-35; Doc. 20-2 at 151-54.) And as explained below, the prior statements by J.C. and Ms. Cabral on which Petitioner relies wholly fail to contradict this testimony.

In his April 2015 pretrial interview of J.C., Petitioner's trial counsel Mr. Coronado engaged in the follow exchange with J.C.:

> JOE CORONADO:  And, in, it's been almost three (3) years, so do you have a memory about how many times you've talked to your parents about what happened to you that night?
>
> [J.C.]:  No.
>
> JOE CORONADO:  When was the last time you talked to your parents about it?
>
> [J.C.]:  Maybe, like a few days ago.
>
> JOE CORONADO:  And when you spoke to them a few days ago about it, did you tell them what you said happened to you that night?
>
> [J.C.]:  Yes.
>
> JOE CORONADO:  Did they ask you about what happened to you that night?
>
> [J.C.]:  No, they don't ask me.

JOE CORONADO:  And when I say "parents" are we talking about both your parents or just one of them?

[J.C.]:  It's just my Mom.

JOE CORONADO:  Alright. Where were you and your Mom when you told her what happened to you that night?

[J.C.]:  Um, just in like the living room.

(Doc. 1 at 43.)

Based on this exchange, Petitioner argues that J.C. said she first disclosed the charged assault to her mother in the living room. (*Id.* at 21.) Read in context, however, it is plain that when J.C. said she told her mother about what happened "just in like the living room," she was referring to "the *last* time [she] talked to [her mother]" about it, "a few days" before the interview.[19] (*Id.* at 43 (emphasis added).) The exchange neither expressly nor impliedly addresses the *first* time J.C. told her mother what happened, and so fails to contradict her or Ms. Cabral's trial testimony on that point.

As for Ms. Cabral's prior statement, in Detective Martinez's interview of Ms. Cabral, the two engaged in the following exchange:

[CABRAL]:   Um, after that I was just … I had been having a headache already and so I, I got in the shower 'cause I had, it was just a long day. I stepped in the shower and, uh, after that I just hear my daughter knocking on my door.

MARTINEZ:  Uh … your daughter's knocking on the door?

CABRAL:  My daughter was knocking on my door.

MARTINEZ:  Okay.

---

[19] Mr. Coronado's follow-up question, *i.e.*, "And how did the subject come up?", shows that he also understood J.C. to be talking about the *last* time she and her mother had discussed what happened, rather than the first. (Doc. 1 at 43.) Specifically, his question makes sense as applied to a parent-child conversation that occurred almost three years after a sexual assault but would be ludicrous as applied to a child's disclosure of the assault right after it happened, while the perpetrator was still in the child's bedroom.

> CABRAL: Um, my house is … in the back room, the laundry room, there's a door
> and there's the shower (inaudible) another door towards my bedroom which where
> [sic] my husband was. He was already in bed. Um … I heard the door knock and,
> uh, I told her to hold on 'cause I was in the shower. I didn't realize what was going
> on and, uh, I stepped out and I asked her what she needed and that's when I heard
> her, she was, she was, um … she was just crying and I, I got, I turned off the shower,
> I got out and I ask her, "What's going on?" She, when [sic] she explained to me
> what was going on.

(*Id.* at 37.)

Based on this exchange, Petitioner argues that Ms. Cabral told Detective Martinez that J.C. first disclosed the charged assault to her in the laundry room. (*Id.* at 21.) However, read in context, it is plain that Ms. Cabral mentioned the laundry room simply to explain where the shower was in relation to it. (*Id.*) She then went on to say, consistent with her trial testimony, that J.C. first disclosed the abuse to her after she got out of the shower and answered J.C.'s knock. (*Id.*)

To state the obvious, an attorney's representation is not deficient when the attorney refrains from cross-examining or trying to impeach a witness using a prior statement that fails to contradict the witness's testimony. *See also Kessler v. Cline*, 335 F. App'x 768, 770 (10th Cir. 2009) ("The manner in which counsel cross-examines a particular witness is a strategic choice and therefore virtually unchallengeable.") (quotation marks omitted). Nor is there any reasonable probability that the result of a criminal proceeding would have been different but for an attorney's decision to refrain from cross-examining or trying to impeach a witness in this pointless way. Thus, fairminded jurists could readily agree with the state habeas court's rejection of Petitioner's ineffective assistance of counsel claim based on his trial counsel's failure to cross-examine or try to impeach J.C. and Ms. Cabral regarding where J.C. first disclosed the charged assault to her mother.

As noted above, Petitioner also argues that his trial counsel provided him with ineffective assistance by failing to cross-examine or impeach Mr. Moure and Ms. Cabral using the prior

inconsistent statements discussed in Section IV(a)(ii), *supra*, regarding where in the master suite Mr. Moure was and what he was doing just before J.C.'s disclosure. (Doc. 1 at 22-25.) But "[e]vidence not presented at trial which at most would have diminished the credibility of [a witness's] testimony, or factual discrepancies not raised which do not go directly to the ultimate issue, are highly unlikely to have resulted in a different outcome." *United States v. Saunders*, No. 04-cr-2147, 2008 WL 11450509, at *8 (D.N.M. Oct. 3, 2008), *report and recommendation adopted*, No. 04-cr-2147, 2008 WL 11450726 (D.N.M. Oct. 31, 2008). And here, as explained below, fairminded jurists could conclude that Mr. Moure's and Ms. Cabral's prior inconsistent statements would not have gone directly to the ultimate issue and would have, at most, diminished the credibility of these witnesses.

Initially, fairminded jurists could conclude that Mr. Moure's and Ms. Cabral's prior inconsistent statements regarding Mr. Moure's location and activities just before J.C.'s disclosure do not go to the ultimate issue of whether Petitioner committed the charged assault. Granted, at the evidentiary hearing held by the state habeas court, Petitioner's state habeas counsel argued that Petitioner's theory was that *Mr. Moure* committed the charged assault, which might have lent some direct relevance to his location just before J.C. disclosed the assault to Ms. Cabral. (Doc. 21, Evid. Hrg. Rec. at 1:50-2:05.) However, there is no evidence in the record to support counsel's argument that this was Petitioner's theory; rather, the record reflects that from trial to this proceeding, he has taken the position that nothing actually happened and either J.C. dreamed the assault, or her parents coerced her into making it up. (*See, e.g.*, Doc. 20-1 at 98; Doc. 28 at 4, 30.) Further, even if this were Petitioner's theory, fairminded jurists could still conclude that Mr. Moure's and Ms. Cabral's prior inconsistent statements do not go to the ultimate issue of who committed the charged assault,

because they do not place Mr. Moure at the scene of the charged assault, *i.e.*, J.C.'s bedroom, at the relevant time.

Consequently, fairminded jurists could conclude that Mr. Moure's and Ms. Cabral's prior inconsistent statements regarding Mr. Moure's location and activities just before J.C.'s disclosure would have, at most, diminished these witnesses' credibility. Moreover, fairminded jurists could conclude that these witnesses' testimony, and therefore their credibility, was peripheral to the State's case. Neither Mr. Moure nor Ms. Cabral ever claimed to have witnessed any part of the charged assault; rather, J.C. was the only witness to it. (*See generally* Doc. 20.) Mr. Moure and Ms. Cabral did testify to some of the events leading up to and following the assault, but they did not even testify to what J.C. disclosed to them, much less offer any direct testimony about what happened during the assault or who committed it.[20] (*See* Doc. 20-2 at 143-97.) Thus, fairminded jurists could agree with the state habeas court's conclusion that Petitioner failed to show a reasonable probability of a different outcome at trial had his counsel cross-examined or impeached Mr. Moure and Ms. Cabral using their prior inconsistent statements. *Saunders*, 2008 WL 11450509, at *8. For these reasons, I recommend that the Court deny Petitioner's Sixth Amendment ineffective assistance of counsel claim based on his trial counsel's failure to cross-examine and impeach J.C., Mr. Moure, and Ms. Cabral using their prior statements.

### iv.  Trial Counsel's Alleged Refusal to Allow Petitioner to Testify

---

[20] Perhaps the most pertinent facts established by Mr. Moure's and Ms. Cabral's testimony are that they left Petitioner at the scene of the charged assault, *i.e.*, J.C.'s bedroom, before it occurred, and that Mr. Moure found him there after J.C.'s disclosure. (Doc. 20-2 at 149-51, 177-78, 188.) This testimony provided some corroboration for J.C.'s testimony that she saw Petitioner in her bedroom shortly after the charged assault. (Doc. 20-1 at 31-34, 65.) Tellingly, however, Petitioner does not contend that this portion of Mr. Moure's and Ms. Cabral's testimony was untruthful; indeed, he has essentially conceded the accuracy of it, including in his testimony at the evidentiary hearing before the state habeas court. (*See* Doc. 21, Evid. Hrg. Rec. at 10:40 to 12:10; *see also* Doc. 28 at 4 ("It must have been around 6 AM when Ms. Patricia Cabral assisted me to [J.C.]'s bedroom, where I stayed till Fernando Moure came to wake me up.").)

Finally, Petitioner claims that his trial counsel provided him with constitutionally ineffective assistance by prohibiting him from testifying at trial. (Doc. 1 at 15-18.) "[A] defendant in a criminal case has the right to take the witness stand and to testify in his or her own defense." *Rock v. Arkansas*, 483 U.S. 44, 49 (1987).

> The decision whether to testify lies squarely with the defendant; it is not counsel's decision. Defense counsel should inform the defendant that he has the right to testify and that the decision whether to testify belongs solely to him. Counsel should also discuss with the defendant the strategic implications of choosing whether to testify, and should make a recommendation to the defendant. Yet counsel lacks authority to prevent a defendant from testifying in his own defense, even when doing so is suicidal trial strategy.

*Cannon v. Mullin*, 383 F.3d 1152, 1171 (10th Cir. 2004) (citations omitted), *abrogated on other grounds by Cullen*, 563 U.S. at 170.

Nevertheless, "[a] trial court has no duty to explain to the defendant … that he has a right to testify or to verify that a defendant who is not testifying has waived the right." *United States v. Williams*, 139 F. App'x 974, 976 (10th Cir. 2005). "[R]equiring judges to question each non-testifying defendant about his decision not to testify may result in defendants feeling pressured to give up their right not to testify." *Cannon v. Trammell*, 796 F.3d 1256, 1273 n.9 (10th Cir. 2015). Rather, to secure this constitutional right, the Tenth Circuit has stated that

> a defendant must alert the trial court that he desires to testify or that there is a disagreement with defense counsel regarding whether he should take the stand. When a defendant does not alert the trial court of a disagreement with his counsel regarding his right to testify, waiver of the right to testify may be inferred from the defendant's conduct.

*Williams*, 139 F. App'x at 976 (citations, quotation marks, and brackets omitted). Moreover, "[b]ecause defense counsel is primarily responsible for advising the defendant of his right to testify[,] the appropriate vehicle for claims alleging that defense counsel violated this right is a

claim of ineffective assistance of counsel." *Wimberly v. McKune*, 141 F.3d 1187, at *3 (10th Cir. 1998) (brackets omitted) (unpublished).

Here, the state habeas court held an evidentiary hearing at which Petitioner testified in support of his claim that Mr. Coronado prohibited him from testifying at trial. (Doc. 19-1 at 432; Doc. 21, Evid. Hrg. Rec.) At the evidentiary hearing, Petitioner testified that, before trial, Mr. Coronado "advise[d]" him not to testify, telling him that it was "not a good idea, [he] should not," but Petitioner "kept disagreeing[.]" (Doc. 21, Evid. Hrg. Rec. at 15:55 to 16:30.) Asked when Mr. Coronado "gave [him] an affirmative no" with respect to testifying, Petitioner responded that it was "during the jury deliberation[.]" (*Id.* at 16:30 to 16:50.) Petitioner elaborated that, after the prosecution rested, Mr. Coronado was "supposed" to call him, and he looked at Mr. Coronado "like [Mr. Coronado] was going to call [him]," but Mr. Coronado "said the defense would like to rest." (*Id.* at 17:00 to 17:25.) According to Petitioner, he was "dumbfounded" and did not know what was proper for him to do. (*Id.* at 17:25 to 17:35.) He testified that after the jury left to deliberate, he conferred with Mr. Coronado, who told him that he was not going to testify. (*Id.* at 17:35 to 17:45.)

At the evidentiary hearing, Petitioner also testified that he had attached as an exhibit to his supplemental state habeas petition the first page of a September 29, 2015 letter that Mr. Coronado wrote in response to Petitioner's September 14, 2015 letter to the trial court judge, in which Mr. Coronado stated:

> You also told [the trial judge] that you told me several times that you wanted to take the witness stand. I advised you against it, but I never forbid you from testifying. As is my practice, I told you that if you insisted on testifying it would be your choice. I always give my clients the pros and cons of testifying, but make it clear that the final decision is the client's. I emphasize to each client that the case does not belong to me, but to the client, and that since the case belongs to the client, the client decides that issue, even if I disagree. At jury trial you were free to testify,

but you never told me you wanted to. At trial you remained silent on that issue. I concluded that you decided not to testify which, in my opinion, was the right choice.

(*Id.* at 3:45 to 4:50; Doc. 1 at 46; Doc. 19-1 at 311.) Petitioner stated that he offered this letter to show that he told Mr. Coronado several times of his desire to testify and that Mr. Coronado advised him against it.[21] (Doc. 21, Evid. Hrg. Rec. at 3:45 to 4:50; *see also* Doc. 1 at 16.) Accordingly, Petitioner has never challenged the letter's admissibility before the state habeas court. *Cf. Greenleaf's Lessee v. Birth*, 30 U.S. 132, 137 (1831) ("In the ordinary course of things, the party offering [documentary evidence] is understood to wa[i]ve any objection to its competency as proof.").

In addition, at the evidentiary hearing, Petitioner described what his trial testimony would have been. Specifically, according to Petitioner, he would have testified that:  (1) he had been drinking at Hooter's and at Mr. Moure's and Ms. Cabral's home; (2) Ms. Cabral gave him a "mixed drink" instead of "[his] drink," which was "a liquor bottle"; (3) about three-quarters of the way through the mixed drink, he felt "wrong," changed clothes, lay down, and could not get back up; (4) he recalled Ms. Cabral helping him to J.C.'s bedroom; (5) the next thing he recalled was Mr. Moure telling him to leave the home; (6) he believed "they" might have put something in his mixed drink; and, (7) he subsequently took a toxicology test but never got the results. (Doc. 21, Evid. Hrg. Rec. at 7:20 to 8:50, 10:40 to 13:10.)

After the hearing, the state habeas court issued a written decision in which it rejected Petitioner's ineffective assistance of counsel claim based on his right to testify, explaining:

---

[21] In his Petition and reply, Petitioner asserts that he also offered this letter to impeach Mr. Coronado's credibility by showing that, in the September 29, 2015 letter, Mr. Coronado stated that he had interviewed the Lara witnesses, whereas in a July 2, 2015 motion, he represented that the Lara witnesses had failed to appear for their scheduled interviews. (Doc. 1 at 16-17, 46-47; Doc. 28 at 37.) However, Petitioner has never presented any evidence to eliminate the possibility that Mr. Coronado interviewed the Lara witnesses in the period between the July 2, 2015 motion and the July 27, 2015 commencement of trial.

Having considered Petitioner's testimony, the letter exhibit from trial counsel, and the record, the [c]ourt is not convinced that trial counsel "forbade" Petitioner from testifying at trial. Trial counsel strongly advised Petitioner not to testify. At trial, defense counsel elected not to call any witnesses. The Petitioner did not in any manner indicate to the [c]ourt his disagreement with his attorney's decision or his desire to testify. The trial court is not required to halt the proceedings and to interrogate a defendant or his counsel to determine whether a defendant has knowingly and intelligently waived the right to testify. Further, the Defendant does not show that counsel was ineffective for failing to call him to the stand to testify at trial, … nor does he show a reasonable probability that the outcome of trial would have been different had counsel called him to the stand at trial, in light of the evidence presented against him by the State.

(Doc. 19-1 at 433 (citation omitted).)

As a preliminary matter, the state habeas court provided Petitioner with a full and fair opportunity to present evidence in support of his claim that Mr. Coronado prohibited him from testifying at trial, and the court's factual determinations to the effect that Mr. Coronado strongly advised him not to testify, but did not forbid it, are reasonable and presumed to be correct. 28 U.S.C. § 2254(e)(1); *Welch*, 639 F.3d at 991. Further, Petitioner has not identified any additional evidence that might tend to rebut these factual determinations clearly and convincingly. (*See generally* Doc. 1.) Another evidentiary hearing before this Court is therefore unnecessary. *Cullen*, 563 U.S. at 183.

Turning to the substance of Petitioner's claim, and in light of the state habeas court's factual determinations, fairminded jurists could certainly agree that Petitioner's right to testify was not violated, that Mr. Coronado's advising him not to testify fell within the wide range of reasonable professional assistance, and that he has failed to show a reasonable probability of a different result had Mr. Coronado called him to the stand. In particular, a fairminded jurist could reasonably conclude that Petitioner's proffered testimony would not have been sufficiently helpful to justify exposing him to cross-examination or to create a reasonable probability of a different verdict. In

short, the state habeas court reasonably determined that Petitioner's ineffective assistance claim

based on his right to testify fails on both prongs of the *Strickland* test. *Lafler*, 566 U.S. at 163;

*Strickland*, 466 U.S. at 687-88. For these reasons, I recommend that the Court deny Petitioner's

ineffective assistance of counsel claim based on his trial counsel's alleged refusal to allow him to

testify at trial.

### v.  Sentencing and Appellate Counsel's Errors on Direct Appeal

For his final ineffective assistance of counsel claims, Petitioner argues that his sentencing

and appellate counsel provided him with constitutionally ineffective assistance on direct appeal.[22]

(Doc. 1 at 29-31.) Specifically, Petitioner argues that these attorneys' representation was

prejudicially deficient because neither of them participated in the trial, consulted with trial counsel,

or reviewed the trial transcripts, and so both failed to raise issues they should have raised on appeal.

(*Id.*) As noted in Section I, *supra*, sentencing counsel Mr. Miller prepared Petitioner's docketing

statement on direct appeal, and appellate counsel Ms. Lalevic filed motions and a memorandum

in opposition to the appellate court's proposed summary affirmance. (Doc. 19-2 at 95-105, 136-

45.)

In its written decision denying Petitioner's habeas petition, the state habeas court concluded

that Petitioner "fail[ed] to demonstrate any actual prejudice or harm" arising out of sentencing and

appellate counsel's performance, because he failed to show "any meritorious basis for appeal that

should have been raised …. He does not show a reasonable probability that he would have

---

[22] The Petition claims a violation, not only of Petitioner's Sixth Amendment right to the effective assistance of counsel on appeal, but also of his Fourteenth Amendment right to one adequate and effective appeal. (Doc. 1 at 3, 29-31); *see Evitts v. Lucey*, 469 U.S. 387, 392 (1985) (recognizing criminal defendant's Fourteenth Amendment right to an adequate and effective appeal). However, the only basis Petitioner asserts for his *Evitts* claim is that he did not receive the effective assistance of counsel on appeal. As such, his *Evitts* claim is coextensive with his ineffective assistance claims and fails for the same reasons.

prevailed on appeal on any grounds." (Doc. 19-1 at 433-34.) The state habeas court added that, contrary to Petitioner's assertions, there was "also no basis to presume prejudice" under the circumstances. (*Id.* at 434.)

Fairminded jurists could agree with these conclusions. In the Petition, Petitioner claims that he received "per se ineffective assistance of counsel" due to sentencing and appellate counsel's lack of familiarity with his criminal trial and should therefore be relieved of the obligation to show prejudice under the second *Strickland* prong. (Doc. 1 at 30.) The Supreme Court has "identified three extreme situations so likely to prejudice the accused that the cost of litigating their effect in a particular case under *Strickland* is unjustified." *Williams v. Trammell*, 782 F.3d 1184, 1200 (10th Cir. 2015) (quotation marks and brackets omitted). These are: (1) "complete denial of counsel" at "a critical stage"; (2) "counsel entirely fails to subject the prosecution's case to meaningful adversarial testing"; and, (3) "counsel is called upon to render assistance under circumstances where competent counsel very likely could not." *Bell*, 535 U.S. at 695–96.

Petitioner does not clearly indicate which of these situations he claims applies to his ineffective assistance of counsel claims based on sentencing and appellate counsel's performance. (Doc. 1 at 3, 29-31.) But regardless, fairminded jurists could agree with the state habeas court that none of them do. The first situation plainly does not apply because there is no dispute that Petitioner was, as a factual matter, represented by counsel at all stages of his direct appeal. The second situation is likewise plainly inapplicable because sentencing and appellate counsel did not *entirely* fail to subject the State's case to meaningful adversarial testing; rather, sentencing counsel filed a docketing statement challenging the trial court's denial of Petitioner's *pro se* motion for new trial, (Doc. 19-2 at 95-105), and appellate counsel filed motions and a memorandum in opposition to the appellate court's proposed summary affirmance. (*Id.* at 136-45); *see Bell*, 535

U.S. at 697 (noting that to "presum[e] prejudice based on an attorney's failure to test the prosecutor's case, … the attorney's failure must be complete").

Finally, as to the third situation, "the circumstances here [do not] eliminate the likelihood that any lawyer, even a fully competent one, could [have] provide[d] effective assistance." *United States v. Lustyik*, 833 F.3d 1263, 1269 (10th Cir. 2016) (quotation marks omitted). Although Petitioner alleges that sentencing and appellate counsel did not familiarize themselves with his criminal trial by consulting with Mr. Coronado, he has proffered no reason why they could not have done so. (Doc. 1 at 30.)

Similarly, although Petitioner alleges that sentencing and appellate counsel did not review the trial transcripts, the record indicates that Ms. Lalevic chose to "request[] that the case be placed on the general calendar rather than wait for the transcripts," despite the fact that Petitioner's relative was supposed to mail them. (Doc. 19-2 at 137 n.1.) Ms. Lalevic explained that she chose not to wait for the transcripts because if she did so, she might "find out they are not what [Petitioner] believes them to be." (*Id.*) But Petitioner does not deny that the transcripts were what he believed them to be; in fact, it seems that they *were* what he believed them to be, because he was able to attach excerpts from the trial transcripts to his *pro se* supplemental state habeas petition. (*See* Doc. 19-1 at 299, 302-04, 317.) In these circumstances, fairminded jurists could reasonably conclude that it would have been possible for fully competent counsel to familiarize themselves with what happened at trial and to provide Petitioner with effective assistance on appeal. The state habeas court's rejection of his *per se* ineffective assistance claim was therefore proper under Section 2254(d).

To establish his ineffective assistance of counsel claims based on sentencing and appellate counsel's performance in the absence of *per se* ineffective assistance, Petitioner was required to

show, first, that his attorneys were objectively unreasonable in failing to raise one or more issues

on appeal, and second, that

> there is a reasonable probability that, but for his counsel's unreasonable failure to raise these claims, [he] would have prevailed on his appeal. When considering a claim of ineffective assistance of appellate counsel for failure to raise an issue, [courts] look to the merits of the omitted issue.

*Neill*, 278 F.3d at 1057 (quotation marks and citation omitted).

Here, fairminded jurists could agree with the state habeas court's conclusion that Petitioner

failed to satisfy the second prong because he did not "show a reasonable probability that he would

have prevailed on appeal on any grounds." (Doc. 19-1 at 434.) In his Petition, Petitioner argues

that sentencing and appellate counsel should have raised all of the other claims raised in the

Petition. (Doc. 1 at 28.) However, a fairminded jurist could find no reasonable probability that

these other claims would have succeeded on appeal in light of the reasons given herein for my

recommendation that they be denied. For all of these reasons, I recommend that the Court deny

Petitioner's ineffective assistance of counsel claims based on his sentencing and appellate

counsel's errors on direct appeal.

### c.  Claim Based on Trial Court's Denial of *Pro Se* Motion for New Trial

Finally, Petitioner claims that the state trial court erred in denying his *pro se* motion for a

new trial.[23] (Doc. 1 at 10-15.) In support, Petitioner cites to New Mexico Rule of Criminal

---

[23] Petitioner lumps this issue in with the issues he claims his sentencing and appellate counsel *should have* raised on appeal, but in fact, sentencing and appellate counsel *did* raise it on appeal. (Doc. 1 at 28; Doc. 19-2 at 95-105, 136-45.)

Procedure 5-614, which governs motions for a new trial in state criminal cases.[24] N.M. R. Crim.

P. 5-614(A). In pertinent part, Rule 5-614 provides that

> [a] motion for new trial based on the ground of newly discovered evidence may be made only before final judgment, or within two (2) years thereafter, but if an appeal is pending the court may grant the motion only on remand of the case. A motion for new trial based on any other grounds shall be made within ten (10) days after verdict or finding of guilty or within such further time as the court may fix during the ten (10) day period.

N.M. R. Crim. P. 5-614(C).

Here, Petitioner filed his *pro se* motion for a new trial on November 19, 2015, more than

ten days after the jury's verdict on July 29, 2015. (Doc. 1 at 11; Doc. 19-1 at 118-68.) On February

2, 2016, the state trial court denied the motion, explaining that

> [p]er Rule 5-614(C) NMRA, a motion for new trial must be made within ten (10) days after verdict or finding of guilty, unless such motion is based upon newly discovered evidence. Defendant does not cite newly discovered evidence as grounds for his request. The ten (10) day deadline for filing the instant motion passed on or about August 13, 2015, and thus Defendant's November 19, 2015, filing is untimely. The untimely request deprives the [c]ourt of jurisdiction to entertain Defendant's motion.

(Doc. 19-1 at 199.)

Petitioner argues that the trial court erred in its application of Rule 5-614 because his *pro*

*se* motion was based on newly discovered evidence. (Doc. 1 at 10-15.) But "[w]hen a federal court,

on habeas review, examines state criminal convictions, the federal court does not sit as a 'super-

appellate' court." *Davis v. Roberts*, 579 F. App'x 662, 665 (10th Cir. 2014). As such,

> federal habeas corpus relief does not lie for errors of state law.... [I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States.

---

[24] In the Petition, Petitioner also cites to New Mexico Rule of Evidence 11-412, which pertains to the admission of evidence of a victim's past sexual conduct in cases involving a defendant's alleged sexual misconduct. (Doc. 1 at 11); N.M. R. Evid. 11-412. However, nowhere in the Petition does Petitioner raise any issues regarding evidence subject to Rule 11-412. (*See generally* Doc. 1.)

*Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991) (quotation marks and citations omitted).

In his Petition, Petitioner fails to argue or show that the state trial court's denial of his *pro se* motion for new trial violated any of his federally-protected rights. (*See* Doc. 1 at 10-15.) Rather, he merely challenges this state-court determination on state-law grounds, *i.e.*, on the state trial court's purported erroneous application of Rule 5-614. (*Id.*) Thus, Petitioner is not entitled to federal habeas relief for the claimed error.[25] *Estelle*, 502 U.S. at 67-68.

For the first time in his reply, Petitioner does assert that the denial of his motion for a new trial violated "[his] con[s]titution and federal law" because the prosecution did not timely respond to the motion under New Mexico Rule of Criminal Procedure 5-120. (Doc. 28 at 26.) However, Petitioner waived this claim by failing to raise it in his Petition. *Windsor*, 623 F. App'x at 947; *Carpenter*, 24 F. App'x at 905 n.5. Further, even assuming the state trial court erred in its application of Rule 5-120, Petitioner's conclusory invocation of "federal law" does not change the fact that this alleged error is also one of state law and thus cannot be a basis for federal habeas relief. *Estelle*, 502 U.S. at 67–68. For these reasons, I recommend that the Court deny Petitioner's claim for federal habeas relief based on the state trial court's denial of his *pro se* motion for a new trial.

## V.    Conclusion

For all of the forgoing reasons, I RECOMMEND that all of the claims in Petitioner's Petition (Doc. 1) be DENIED and that the Petition be DISMISSED WITH PREJUDICE.

---

[25] Furthermore, even if the evidence Petitioner identifies as "newly discovered" met all of the other state law requirements for such evidence, which the Court need not decide, it plainly fails to meet "the requirement that the evidence [was] discovered *after trial*." *New Mexico v. Volpato*, 1985-NMSC-017, ¶¶ 7, 13, 102 N.M. 383, 384-85, 696 P.2d 471, 472-73 (emphasis added). Specifically, two of the three statements Petitioner identifies as newly discovered were made *at* trial, and the third was made to Mr. Coronado about three months *before* trial. (Doc. 1 at 10-15.)

_____

KIRTAN KHALSA
UNITED STATES MAGISTRATE JUDGE

---

**THE PARTIES ARE FURTHER NOTIFIED THAT WITHIN 14 DAYS OF SERVICE** of a copy of these Proposed Findings and Recommended Disposition they may file written objections with the Clerk of the District Court pursuant to 28 U.S.C. § 636(b)(1).  **A party must file any objections with the Clerk of the District Court within the fourteen-day period if that party wants to have appellate review of the proposed findings and recommended disposition.  If no objections are filed, no appellate review will be allowed.**